239 So.2d 304

**W. S. DICKEY CLAY MANUFAC-
TURING COMPANY**

v.

**Robert J. McCLENEY and
Lester Leon Whitsett.**

**6 Div. 254.**

Court of Appeals of Alabama.

March 12, 1968.

Rehearing Denied by Court of Appeals
May 21, 1968.

(Transferred to Court of Civil Appeals,
6 Div. 80, 80–A, Oct. 1, 1969).

Thomas, Taliaferro, Forman, Burr & Murray, Birmingham, for appellant.

John J. Coleman, Jr., Thos. W. Thaggard, Jr., A. H. Gaede, Jr., and Bradley, Arant, Rose & White, Birmingham, for Alabama State Chamber of Commerce and Associated Industries of Alabama, amici curiae.

JOHNSON, Judge.

This is an appeal from the Circuit Court of Jefferson County, Alabama, Bessemer Division, from a judgment awarded to appellee McCleney of $96.00 and costs, and of a judgment of $800.00 and costs awarded to appellee Whitsett for unemployment compensation. These two cases were consolidated by agreement and tried together.

The court recognizes with appreciation and has given due study to all briefs filed in this cause.

Brobston & Brobston, Bessemer, Corretti, Newsom & Rogers, Birmingham, for appellees.

The trial arose prior to, and continued through, an arbitration hearing by Hon. Frank Dominick, Arbitrator. The record in the case at bar reflects, by an exhibit to appellant's motion for a new trial, the complete record of said arbitration hearing held on April 26, 1966, in the Federal Mediation and Conciliation Service Offices in Birmingham. The Arbitrator found against the employees (appellees).

Appellees (appellants below) appealed to the circuit court and trial was had on March 28, 1966. The appeal was perfected to review judicially an administrative decision by the Board of Appeals of the State Department of Industrial Relations dated July 26, 1965, denying the appellees unemployment compensation benefits on the grounds that their unemployment was directly due to a labor dispute at their place of employment. "16 or 17" individuals are involved in this question of unemployment

compensation, and the cases of these two appellees were consolidated as a "test" case. The Department of Industrial Relations of Alabama was also a party defendant to this trial, and agreed to "be governed by the adjudication of these two cases" concerning the other interested workers.

The case, tried without a jury, presented volumes of evidence of alleged violence connected with the strike. The United Brick and Clayworkers of America (herein referred to as U.B.C.W.A.) and its Local No. 827, are unincorporated unions. About seventeen employees of appellant, known as Inspectors, are in Local No. 827. Appellant employs about 200 workers to manufacture clay pipe and fittings. On February 8, 1965, Local No. 827 commenced a strike against appellant's plant, setting up picket lines at about 5:00 A.M. During the period of the strike there was a collective bargaining contract between the appellant and the United Steelworkers of America (the union of most of the plant workers), said contract dating back to May of 1964 and containing a no-strike clause. Once the strike began, Mr. J. W. McCroskey, the Plant Superintendent, sent a wire to the United Steelworkers asking their position on the Inspector's strike. In a wire from Mr. R. E. Farr, Director of District 36 of the United Steelworkers Union, dated February 10, 1965, this Union stated in part as follows:

"* * * PLEASE BE ADVISED THAT THE UNITED STEELWORKERS OF AMERICA HAS NOT AUTHORIZED A WORK STOPPAGE AT YOUR PLANT NOR ARE WE IN ANY WAY SUPPORTING SUCH ACTION."

Both of the appellees were members of this same United Steelworkers Union during the course of the strike.

For the first few days of the strike Mr. McCroskey stated that the plant "would not operate until further notice." Beginning February 17, 1965, violence occurred, causing destruction of company property, damage to personal vehicles of non-striking employees, threats, rock throwing, and shooting at cars, buildings and individuals.

On February 18, 1965, Mr. McCroskey mailed a letter to the non-striking employees advising them that work was available and that they were scheduled to report for work on February 22, 1965. During this period some of the non-striking employees had returned to work and it was against them that the initial acts of violence occurred.

This February 18th letter advised all of the workers to whom it was sent that under the terms of "the current labor contract," failure to return to work might result in disciplinary action.

On February 24, 1965, Mr. McCroskey mailed a second letter to the non-striking employees. This letter stated in part that the workers should report for work "at 8:00 A.M., March 1, 1965" and that failure to report for work would cause the company to "terminate your employment with our Company" as a violation of the labor contract. Appellees' employment was terminated because of their noncompliance with this letter of instruction.

Detective Walter Dean of the Sheriff's Department of Jefferson County, Bessemer Division, testified as to violence investigated by his office beginning February 17, 1965. He stated that no arrests were made though extra patrols were used and two officers were stationed in the woods to apprehend those parties shooting at cars.

On cross-examination Detective Dean stated that the extra patrols were added "within 1 or 2 days after the first incident," and that no one in his office ever refused to go into the plant during the strike.

Mr. Leon Crumpton, International Representative of the U.B.C.W.A. for "about 2 years," testified that he was engaged in such capacity in February of 1965; that he had 16 clayworkers at appellant's plant; that the strike vote was taken on February

7, 1965; and that no information of this strike was communicated to the Steelworkers' Union. Crumpton stated that the picket lines began February 8, 1965, at about 5:00 A.M. He further stated that when the other workers came to work, a "very uneasy situation" was created. He estimated that from 250–300 people were in the crowd. Crumpton testified that he heard threats and arguments and the crowd was "noisy and boisterous."

On cross-examination Crumpton testified that he never saw any violence. He stated that he had never seen employer's Exhibit No. 3, which was literature exhorting steelworkers not to come to work during the strike.

Robert J. McCleney, one of the appellees, testified that he has been employed "at Hayes" since March 10, 1965. He stated that in February of 1965 he was employed by appellant and was a member of the Steelworkers' Union; that he had no advance notice of the strike and reported for work on February 8 and found "about 150 or better" milling around at the gate; that there were threats to not go into the plant; that on February 9 and 10 the same condition occurred; that he received the two letters from Mr. McCroskey, supra, about reporting for work; and that he checked the picket line again and had heard of acts of violence, but never saw any violence personally.

On cross-examination Mr. McCleney testified as to his testimony before the Board of Appeals in 1965 as follows:

"Q. Do you remember my asking you some questions on that date?

"A. Yes, I do.

"Q. Do you recall on page 41 of the transcript on that occasion I asked you, 'You don't think it was proper to cross the picket line, did you?' and your answer was, 'I never think it is proper to cross any man's picket line?'

"A. One moment, I have that with me in my pocket. Will you read that again?

"Q. You didn't think it was proper to cross a man's picket line?

"A. Yes, now, what I want to say is—

"MR. STELZENMULLER: That's all the questions I have."

Lester L. Whitsett, one of the appellees, testified that he is a former employee of appellant; that he reported for work on February 8, 1965, and found "confusion" caused by "around 250" people milling around; that he heard threats; and that one Fred Williams told him (the witness) that his (Williams') car was shot into before the strike and for him (the witness) to not cross the picket line. Whitsett stated that he received a copy of each of the two letters mailed by Mr. McCroskey to the workers, supra.

On cross-examination Whitsett testified that he crossed the picket line and went into the plant to vote in the Steelworkers' election on February 9, 1965, and was not "interfered" with, nor did he see any of the other 100 workers who went in to vote "interfered" with. Whitsett stated that Mr. McCroskey told the workers who were assembled in the plant to vote that they (the steelworkers) had a no-strike clause in their contract. He stated that he registered for unemployment compensation on February 8, 1965; that McCleney was there also; that the reason he put on his form was "due to strike" of U.B.C.W.A., and "I do not belong to that Union."

Mr. J. W. McCroskey, appellant's plant manager, testified that he had a conversation with appellee McCleney in part as follows:

"On one occasion I had a conversation and in my best memory, McCleney, as I recall, said to me, 'You know, if these boys go out on strike, we will have to go out with them. They are Union people and work with these people close and we will probably go out with them.' "

McCroskey stated that he first knew of the strike when he arrived for work on February 8, 1965, and found "a sizable group" outside of the plant; that he saw no violence and heard no threats on that date; that though he did not hear the pickets ask other workers to honor their picket line on the 8th, he did hear such remarks at a later date; that 80 employees reported for work on February 17, and 117 on February 18; and that there was, to his knowledge, no violence to or interference with these workers. McCroskey stated that he had tried to induce the workers to return to their jobs. Referring to his notes, he testified that he had spoken with some of the people involved in this "test" case; that Beck had stated, "I cannot cross a legal picket line;" that Antinero had wanted to come to work, but not "alone;" that Ellis had said he would not cross the picket line; that Key said he would not break his oath as an individual Union member and cross a picket line; that Ed Sellers said he was afraid to come back to work; that 16 men who had filed for unemployment compensation had never returned to work; and that the strike was finally settled on February 4, 1966.

█ In their brief to this court, appellees have included a Motion to Dismiss appeal, and a Motion to Strike Assignments of Error and Brief. These two motions cannot be considered by this court because they were improperly presented for review, not being on transcript paper. Revised Rules of Sup.Ct. of Ala., Rule 15. There was no copy in the record of either motion.

█ Appellant's claim of error that "the judgment is contrary to the law" cannot be considered by this court as such an assignment "presents nothing for review and is without merit." Smith v. Smith, 279 Ala. 570, 188 So.2d 530.

█ ·The claim by appellant that the judgment "is unsupported by any evidence" is also not before this court as inadequate to invite review. Horton v. Mobile Cab and Baggage Co., Ala., 198 So.2d 619.

█ Appellant's allegation that error was committed by the trial court in denying their motion for a new trial, presents the grounds and attached exhibit of the said motion for a new trial for consideration and review by this court. McDowell & McDowell, Inc. v. Barnett, 277 Ala. 302, 169 So.2d 324. See also Lonnie Russell Ford, Inc. v. Mitchell, 279 Ala. 340, 185 So.2d 132.

The "bone of contention" as presented to this court, by all concerned parties, revolves around Code of Ala., 1940, Tit. 26, Sec. 214(A), and a *"violence exception"* thereto. Tit. 26, supra, states as follows:

"An individual shall be disqualified for total or partial unemployment:

"A. For any week in which his total or partial unemployment is directly due to a labor dispute still in active progress in the establishment in which he is or was last employed; for the purposes of this section only, the term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee. This definition shall not relate to a dispute between an individual worker and his employer."

Appellee relies upon the case of Pledger v. Department of Industrial Relations, 40 Ala.App. 127, 108 So.2d 697, in which Judge Cates stated that, "Had the trial court determined that Mr. Pledger had a well-founded fear of personal violence, then his refusal to cross the picket line would not have entailed his disqualification." The case relied upon in *Pledger*, supra, is Speagle v. United States Steel Corporation, 268 Ala. 3, 105 So.2d 717, and at 39 Ala.App. 559, 105 So.2d 721. The *Speagle* case at 105 So.2d 719 (hereinafter referred to as *Speagle No. 1*) certified some questions

from this court to the Supreme Court of Alabama. The first question from *Speagle No. 1* asks if voluntary refusal to cross a peaceful picket line in a labor dispute, when a job is available, disqualifies a worker from unemployment compensation, and the Supreme Court of Alabama ruled that it did. Tit. 26, Sec. 214(A), *supra*. Another question asked was whether the worker failed to qualify if he refused to cross a picket line "because of his adherence to a tenet of his trade unionism," and the Supreme Court of Alabama ruled that it did. The last question asked in *Speagle No. 1* was:

"Is an employee's statement of his apprehending violence to his person, if he were to cross a picket line, legal evidence; and, if so, is such apprehension (without further evidence of anticipated violence) which leads to his refusal to cross a picket line (thrown up by a union to which he does not belong) before his working establishment sufficient and good ground to remove the disqualifying effect of said Sec. 214, subd. A, as amended, *supra*?"

The Supreme Court of Alabama, all justices concurring, answered as follows:

"In answer to this question it is our opinion that an employee's statement of his apprehension of violence to his person if he were to cross a picket line would not be legal evidence. McGuff v. State, 248 Ala. 259, 27 So.2d 241."

■ In Speagle v. United States Steel Corp., 39 Ala.App. 559, 105 So.2d 721 (hereinafter called *Speagle No. 2*), this court decided its case with reference to the answers received from the Supreme Court in *Speagle No. 1*. Judge Cates, in deciding *Speagle No. 2* stated that the trial court's disqualification of Mr. Cheney was upheld as he had work and would cross the picket line "if there was no danger in getting hurt afterwards." Cheney saw no violence himself and it was undisputed that work awaited him in the mill. The conclusion reached was that the complainant had the burden of

showing "reasonable apprehension." From this, *Pledger*, supra, was derived, and the *"violence exception"* inserted into the Code interpretation. Thus, according to *Pledger*, supra, a reasonable apprehension or fear of personal violence would not disqualify a non-striking employee who refused to cross a picket line from unemployment compensation.

Therefore, from the testimony here presented and the reports of damage shown by the sheriff's office, it may be deduced that appellees had a "reasonable apprehension" of being injured, and were entitled to unemployment compensation awards. However, this court would qualify these same awards, or others of their ilk, by a strict limitation upon their being awarded. There must be other legal evidence of acts of violence besides the words or testimony of the parties claiming such compensation, *Speagle*, supra, and that period of time during which unemployment compensation awards may be granted because of this *"violence exception"* to Tit. 26, Sec. 214(A), supra, should also be limited and strictly construed. By Code of Ala., 1940, Tit. 26, Sec. 213(A), to be eligible for an unemployment compensation award, the unemployed individual must register weekly for his benefits. The record discloses a copy of the Unemployment Compensation Form filled out and filed by appellee Whitsett, as Employer's Exhibit No. 4. This exhibit discloses that appellee Whitsett filed claims for 25 weeks for unemployment compensation, for the weeks ending "2–20, 1965", through "10–13, 1965," with only those weeks of April 3 to May 15 and September 11 to October 6, 1965, being periods when appellee Whitsett did not file a claim.

An injunction against further violence was issued in March of 1965. At that time, just as the reasonable inference as to "fear of personal injury" had existed prior to that date, viz., the necessity of an injunction and its contents, ipso facto, after that date that inference necessary to constitute the *"violence exception"* to Tit. 26, Sec. 214

(A), supra, vanished, and no longer was available prima facie as an excuse for not crossing the picket line. Refusal to return to work would then have constituted voluntary failure to cross a peaceful picket line, and, in effect, participation in the strike, thus disqualifying appellee Whitsett and any other party so engaged. Speagle v. United States Steel Corp., supra; State Dept. of Industrial Relations v. Ford, 278 Ala. 352, 178 So.2d 190; Mancini v. Administrator, 24 Conn.Sup. 461, 194 A.2d 540; Marczi v. Board of Review, 63 N.J.Super. 75, 163 A.2d 723; and Sangamo Electric Co. v. Donnelly, 26 Ill.2d 348, 186 N.E.2d 230.

We would then hold that though a *"violence exception"* exists, it should not be a tool to aid in promotion of work stoppage, strikes, and violence. Thus, this "exception" must be carefully used, and strictly construed. There must be (1) additional legal evidence to support an apprehension of violence—other than by the mere words of parties claiming such exception; (2) any use of this "exception" is unavailing if no legal evidence of violence exists; (3) the "exception" vanishes as a factor under Tit. 26, Sec. 214(a), supra, when *any* injunction halting violence per se issues; and (4) any party participating as a party to a strike in such a manner that it may without reasonable doubt be said that said employee is participating actively, does not fall within the purview of this exception.

The judgment in this cause is conditionally affirmed, but remanded with instructions to hold further hearing into that period of time elapsing from the end of the violence for the duration of all claims. In the instances where it is found that no legal evidence of violence exists, viz., an injunction enforced against violence, this "exception" will not be an available *excuse* for qualification for unemployment compensation.

Affirmed conditionally and remanded with instructions.

ON REHEARING

PER CURIAM.

A non-striking employee who refuses to cross a picket line is not disqualified for unemployment compensation where such refusal is based upon a reasonable apprehension or fear of personal injury. *Pledger*, supra.

However, when legal evidence upon which such exception is grounded ceases to exist, the exception likewise ceases to exist and at that time it is incumbent upon the employee to seek reinstatement to his position of employment with the company. Failure to do so within a reasonable time after the "violence exception" ceased to exist would constitute a voluntary refusal to work notwithstanding the company's letter of February 24, 1965, threatening discharge if he did not report for work.

We do not herein intend to imply that in every case an employee who may be unjustifiably discharged must apply for reinstatement before he is entitled to unemployment compensation. This requirement is to apply only to those cases wherein the facts pertinent to unemployment compensation are analogous to those herein prevailing.

Application overruled.